11th Court of
Appeals

 Eastland, Texas

          Opinion

 

Kenneth
G. Cone

Appellant

Vs.                   No.
11-00-00003-CV - Appeal from Borden County

Fagadau Energy
Corporation and 

Sanford
P. Fagadau

Appellees

 

This appeal involves a dispute between parties to
an operating agreement executed for the joint operation of a group of oil and
gas leases covering approximately 850 acres located in Borden County.  Fagadau Energy Corporation (FEC) was the
operator of the leases under the operating agreement.  Kenneth G. Cone (Cone) was a working interest owner of the leases
and a party to the operating agreement. 
Sanford P. Fagadau (Fagadau) was the president and sole shareholder of
FEC.  FEC proposed the institution of a
water flood program in the mid-1990s for the purpose of obtaining secondary
recovery of hydrocarbons from the contract area covered by the operating
agreement.  FEC also proposed that the
contract area be unitized in conjunction with the water flood program.  FEC projected a capital cost of
approximately $950,000.00 for the installation of the water flood.  All of the working interest owners agreed to
the water flood and unitization except Cone. 
Despite Cone=s
nonparticipation, FEC proceeded with the installation of the water flood and
unitization after obtaining approval from the Railroad Commission of
Texas.  The record reflects that
production from the unit increased significantly as a result of the water flood.

Litigation ensued soon after the installation of
the water flood.  Cone took exception to
various charges made to his account by FEC as production expenses.  Cone believed that the charges were
improperly assessed to his account in light of his nonparticipation in the
water flood.  FEC initially filed suit
against Cone to obtain a determination of Cone=s
liability for the payment of the disputed charges.  Cone responded by asserting several counterclaims against
FEC.  Cone also sought to impose personal
liability against Fagadau for the claims asserted against FEC.








The majority of the parties= contentions 
were determined prior to trial by summary judgment and by the granting
of special exceptions in FEC=s
favor.   The few remaining issues were
decided after a  bench trial.  Cone appeals each of these adverse rulings
by asserting 15 points of error.  Cone
complains of the trial court=s
entry of partial summary judgment in his first point of error.  His second point of error attacks the
granting of a special exception.   His
third, fourth, fifth, sixth, seventh, eighth, ninth, and tenth points of error
attack the trial court=s
granting FEC=s
no-evidence motion for summary judgment. 
These points of error are comprised of numerous subparts, many of which
are repetitious. Cone=s
eleventh point of error consists of four subparts which attack the trial court=s no-evidence determination
regarding Fagadau=s
personal liability.   Cone=s twelfth and thirteenth
points of error attack the sufficiency of the evidence to support the trial
court=s judgment.  His fourteenth point of error attacks the
imposition of TEX.R.CIV.P. 13 sanctions by the trial court.  Cone=s
fifteenth point of error addresses the awarding of attorney=s fees by the trial court.  We affirm in part, reverse and render in
part, and reverse and remand in part.

The resolution of this appeal requires this court
to interpret the parties=
operating agreement.  The operating
agreement was prepared on a form promulgated by the American Association of
Petroleum Landmen referred to as the A.A.P.L. Form 610-1982 MODEL FORM
OPERATING AGREEMENT.  Specifically, this
appeal asks the court to interpret the terms of the operating agreement with
respect to the following questions: 
I.  Did the conversion of a
producing well into an injection well constitute an abandonment of that
well?  II. Are a non-operator=s causes of action against
the operator for violations of the operating agreement limited only to actions
of gross negligence or willful misconduct? 
III. Must the operator receive consent from all of the non-operators
before installing a water flood? 

This appeal also involves questions of the
sufficiency of the evidence.  These
additional questions include:  IV. Was
Cone=s evidence of
liability and damages sufficient?  V.
Did FEC convert Cone=s
property by withholding Cone=s
proceeds?  VI.  Were the sanctions and attorney=s
fees awarded by the court supported in law and fact?  and VII. What is the personal liability of Fagadau, the president
of FEC, the operator of the property?

 








I. Did the conversion of a producing well into an
injection well constitute an abandonment of that well? 

Cone complains in his first point of error of the
trial court=s entry of
partial summary judgment regarding the conversion of producing wells into water
injection wells.  The producing wells
were converted into injection wells for the purpose of instituting the water
flood.[1]   Cone contends that the conversion of the
wells  constituted  abandonment under the terms of the operating
agreement such that Cone should have been offered the right to assume control
of the wells.  Early in the proceedings,
the trial court granted FEC=s
motion for partial summary judgment by ruling that the conversion of the wells
did not constitute abandonment under the terms of the operating agreement.  Because the construction of a document is a
matter of law, we review the trial court=s
construction of the operating agreement on a de novo basis.  See Matter of Humphreys, 880 S.W.2d 402, 404
(Tex.), cert. den=d,
513 U.S. 964 (1994); JVA Operating Company v. Kaiser-Francis Oil Company, 11
S.W.3d 504, 506 (Tex.App. B
Eastland 2000, pet=n
den=d). 

The relevant portion of the operating agreement
addressing abandonment of wells is VI.E.2, which is located under the Article
titled ADRILLING AND
DEVELOPMENT@ which
reads:

VI.E.2. Abandonment of Wells that have
Produced:  Except for any well in
which a Non-Consent operation has been conducted hereunder for which the
Consenting Parties have not been fully reimbursed as herein provided, any well
which has been completed as a producer shall not be plugged and abandoned
without the consent of all parties.  If
all parties consent to such abandonment, the well shall be plugged and
abandoned in accordance with applicable regulations and at the cost, risk and
expense of all the parties hereto.  If,
within thirty (30) days after receipt of notice of the proposed abandonment of
any well, all parties do not agree to the abandonment of such well, those
wishing to continue its operation from the interval(s) of the formation(s) then
open to production shall tender to each of the other parties its proportionate
share of the value of the well=s
salvable material and equipment, determined in accordance with the provisions
of Exhibit AC,@ less the estimated cost of
salvaging and the estimated cost of plugging and abandoning.  Each abandoning party shall assign the
non-abandoning parties, without warranty, express or implied, as to title or as
to quantity, or fitness for use of the equipment and material, all of its
interest in the well and related equipment, together with its interest in the
leasehold estate as to, but only as to, the interval or intervals of the
formation or formations then open to production.








As set forth by the supreme court in National Union Fire
Insurance Company of Pittsburgh, Pennsylvania v. CBI Industries, Inc., 907
S.W.2d 517, 520 (Tex.1995):

The
primary concern of a court in construing a written contract is to ascertain the
true intent of the parties as expressed in the instrument. If a written
contract is so worded that it can be given a definite or certain legal meaning,
then it is not ambiguous.  Parol
evidence is not admissible for the purpose of creating an ambiguity.  

 

If, however, the language of a...contract is
subject to two or more reasonable interpretations, it is ambiguous.  Whether a contract is ambiguous is a question
of law for the court to decide by looking at the contract as a whole in light
of the circumstances present when the contract was entered.  (Citations omitted)

 

See also Coker v. Coker, 650 S.W.2d 391, 393 (Tex.1983).  

We do not construe this provision of the operating
agreement as being ambiguous.   The
operative language of the provision is the phrase Aany well which has been completed as a
producer shall not be plugged and abandoned without the consent of all parties.@  Cone does not dispute the fact that the wells have not been
plugged.   Irrespective of this fact, he
contends that the wells in question have been abandoned because the efforts to
remove hydrocarbons directly from them have ceased. 








We disagree with Cone=s construction of this provision.  AAbandonment@ involves a  relinquishment of possession.  See Pearson v. Black, 120 S.W.2d 1075, 1079
(Tex.Civ.App. B
Eastland 1938, no writ).  The wells had
not been abandoned within the ordinary and customary meaning of the term
because the wells continued to be utilized on a daily basis for the purpose of
water injection.    Furthermore, even
though hydrocarbons were not produced directly from these wells, the wells were
used for the purpose of obtaining production from other wells which produce
from the same Ainterval(s)
of the formation(s) then open to production@
for which Cone is compensated.   As
noted by a leading treatise on the subject, A[t]he
primary purpose of injecting gas or water into a reservoir is to cause the
injected substance to move from the input wells toward the producing wells,
driving the oil or wet gas before them.@  1 W. L. SUMMERS, THE LAW OF OIL AND GAS ' 76 (1954).  We note that our holding is consistent with
Osborn v. Anadarko, 996 P.2d 9 (Wy.2000), a Wyoming Supreme Court case which
determined that the conversion of a producing well into an injection well did
not constitute abandonment under a farmout agreement.  Cone=s
Point of Error No. 1 is overruled.

In his Points of Error Nos. 3(b) and 7(c), Cone
additionally complains of the trial court granting FEC=s no-evidence motion for summary judgment by
determining that there was no evidence that FEC violated the operating
agreement by converting producing wells into injection wells.  The determination of this issue turns wholly
upon a construction of the operating agreement=s
abandonment provision which we have addressed in discussing Cone=s Point of Error No.
1.  Accordingly, Cone=s Points of Error Nos. 3(b)
and 7(c) are also overruled.

II. Are a non-operator=s causes of action against the operator for violations
of the operating agreement limited only to actions of gross negligence or
willful misconduct?  

 

Cone=s
second point of error attacks the trial court=s
granting of a special exception regarding the applicable level of culpability
for FEC=s alleged
violations of the operating agreement. 
Specifically, the trial court struck Cone=s
pleadings to the extent they sought to hold FEC liable in any respect for losses
sustained or liabilities incurred absent a showing of gross negligence or
willful misconduct on the part of FEC. 
The trial court based its ruling on the following exculpatory provision
of the operating agreement set out in V.A. under the Article titled AOPERATOR@ which states:

V.A.
Designation and Responsibilities of Operator:  [FEC] shall be the Operator of the Contract Area, and
shall conduct and direct and have full control of all operations on the
Contract Area as permitted and required by, and within the limits of this
agreement.  It shall conduct all such
operations in a good and workmanlike manner, but it shall have no liability as
Operator to the other parties for losses sustained or liabilities incurred,
except such as may result from gross negligence or willful misconduct.

 

In granting the special exception, the trial court held that any
complaint made by Cone that was not based on allegations of gross negligence or
willful misconduct did not state a cause of action.  When a trial court grants special exceptions for failure to state
a cause of action, we review that issue of law using a de novo standard of
review.  See  Pack v. Crossroads, Inc., 53 S.W.3d 492, 507 (Tex.App. B Fort Worth 2001, no pet=n h.); The Butler Weldments
Corporation v. Liberty Mutual Insurance Company, 3 S.W.3d 654, 658 (Tex.App. B Austin 1999, no pet=n).








Cone asserts that he should have been able to
assert liability against FEC for alleged breaches of the terms of the operating
agreement under a simple breach of contract standard.  In this regard, Cone contends that various charges were
improperly assessed to his account in violation of the operating
agreement.  As discussed  in detail in Paragraph IV below, Cone
protested charges for the purchase of water used in connection with the water
flood, the assessment of the non-consent penalty against his interest, and the
charging of monthly accounting fees to his account. 

In the operating agreement, the language which
requires a showing of gross negligence and willful misconduct immediately
follows the provision requiring the operator to conduct operations in a good
and workmanlike manner.  Cone=s complaints did not allege
the failure of FEC to operate in a good and workmanlike manner.  Rather, Cone=s
complaints alleged breaches of specific terms of the agreement and are in the
nature of an accounting.  The operating
agreement=s accounting
procedure exhibit specifically stated the amount that non-operators may be
charged for materials.[2]
The operating agreement dictated the time within which an election to consent
is to be exercised.  The COPAS
specifically stated the amount that a non-operator may be charged for overhead.  The gross negligence/willful misconduct
requirement applies to any and all claims that the operator failed to conduct
operations in a good and workmanlike manner. 
The court in Abraxas Petroleum Corporation v. Hornburg, 20 S.W.3d 741
(Tex.App. B El Paso
2000, no pet=n),
reached a similar result in interpreting this same clause.[3]  The trial court erred in striking Cone=s allegations for breach of
contract.

No judgment may be reversed on appeal unless the
court concludes that the error complained of probably caused the rendition of
an improper judgment or probably prevented a defendant from presenting the case
to the court of appeals.  TEX.R.APP.P.
44.1(a).  Our review of the record does
not indicate that the trial court=s
ruling on special exceptions resulted in the rendition of an improper
judgment.  Despite the trial court=s granting of a special
exception, the record indicates that the trial court heard and determined all
of Cone=s allegations
at the bench trial based on a simple breach of contract standard.   Because the error is harmless, Cone=s Point of Error No. 2 is
overruled.








III. Must the operator receive consent from all of the
non-operators

 before
installing a water flood? 

 

Most of Cone=s
claims against FEC were denied by the trial court=s
granting of FEC=s
no-evidence motion for summary judgment.  
Cone=s Points
of Error Nos. 3(a), 7(a), and 7(b) attack the trial court=s determination that there
was no evidence  that Cone=s consent was required  in order for the water flood to be
instituted.    The  summary 
judgment  evidence  offered 
by  Cone  in response to the no-evidence motion for
summary judgment was the undisputed cost of the project and the operating
agreement itself. 

The
trial court must grant a no-evidence motion for summary judgment unless the
non-movant produces evidence that raises a genuine issue of material fact on
the challenged element of his claim or defense. TEX.R.CIV.P. 166a(i). The
appellate court reviews evidence presented in response to a motion for a
no-evidence summary judgment in the same way it reviews evidence presented in
support of, or in response to, a motion for traditional summary judgment:  it accepts as true evidence favorable to the
non-movant and indulges every reasonable inference and resolves all doubts in
favor of the non-movant.  Hight v.
Dublin Veterinary Clinic, 22 S.W.3d 614, 619 (Tex.App. - Eastland 2000, pet'n den'd);
see American Tobacco Company, Inc. v. Grinnell, 951 S.W.2d 420, 425 (Tex.1997);
Nixon v. Mr. Property Management Company, Inc., 690 S.W.2d 546, 548-49
(Tex.1985).  The appellate court
reviews, however, only evidence presented by the non-movant. Rule 166a(i);
Hight v. Dublin Veterinary Clinic, supra at 618-19.  If the non-movant presents more than a scintilla of evidence on
the disputed element, a no-evidence summary judgment is improper.  Hight v. Dublin Veterinary Clinic, supra;
Denton v. Big Spring Hospital Corporation, 998 S.W.2d 294, 298 (Tex.App. -
Eastland 1999, no pet'n); cf. Merrell Dow Pharmaceuticals, Inc. v. Havner, 953
S.W.2d 706 (Tex.1997), cert. den=d,
523 U.S. 1119 (1998).








 The
resolution of the consent issue turns wholly upon a construction of the
operating agreement, a determination which is ordinarily considered to be the
resolution of a question of law.[4]  Cone included the operating agreement as a
part of his summary judgment evidence in response to the no-evidence motion for
summary judgment.  Therefore, the
operating agreement is before this court for review because the appellate court
only reviews evidence presented by the non-movant with respect to a no-evidence
motion for summary judgment.  Hight v.
Dublin Veterinary Clinic, supra. We
review the trial court=s construction of the operating agreement
on a de novo basis.  See Matter of
Humphreys, supra; JVA Operating Company v. Kaiser-Francis Oil Company, supra.

Cone=s
consent argument is premised on VII.D.3 of the operating agreement located
under the Article titled AEXPENDITURES
AND LIABILITY OF PARTIES@
which states in relevant part:

VII.D.3. Other Operations: Without the
consent of all parties, Operator shall not undertake any single project
reasonably estimated to require an expenditure in excess of Fifteen thousand
Dollars ($15,000) except in connection with a well, the drilling,
reworking, deepening, completing, recompleting, or plugging back of which has
been previously authorized by or pursuant to this agreement.

 

Cone asserts that, since the water flood
program=s initial cost
was in excess of $15,000.00, FEC could not install the water flood without his
consent. Cone further contends that the installation of the water flood without
his consent constituted a breach of the operating agreement.  








The relationship between Cone and the other
working interest owners of the contract area was that of cotenants of the
various leaseholds which comprise the contract area.  See Rankin v. Naftalis, 557 S.W.2d 940, 946 n. 6 (Tex.1977).  A cotenant has the right to extract minerals
from common property without first obtaining the consent of his cotenants.  Byron v. Pendley, 717 S.W.2d 602, 605  (Tex.1986); Cox v. Davison, 397 S.W.2d 200,
201 (Tex.1965); Burnham v. Hardy Oil Co., 147 S.W. 330, 335 (Tex.Civ.App. B San Antonio 1912), aff=d on other grounds, 195
S.W. 1139 (Tex.1917).[5]  This rule is founded on the distinctive
legal relationship existing between cotenants: 
each cotenant has a right to enter upon the common estate and a
corollary right to possession.  Byron v.
Pendley, supra; Burnham v. Hardy Oil Co., supra.  As stated by the court in Burnham:

It seems to us that the peculiar circumstances of
a cotenancy in land upon which oil is discovered warrant one cotenant to
proceed and utilize the oil, without the necessity of the other cotenants
concurring.  Oil is a fugitive substance
and may be drained from the land by a well on adjoining property.  It must be promptly taken from the land for
it to be secured to the owners.  If a
cotenant owning a small interest in the land had to give his consent before the
others could move towards securing the oil, he could arbitrarily destroy the
valuable quality of the land.  

 

The provision upon which
Cone relies is contained within a portion of the operating agreement entitled ALimitation of Expenditures.@  This provision applies to expenditures which the operator may
charge to the other owners for activities conducted on the contract area.  It provides a means of protecting a non-operating
owner from being charged for a large expenditure that exceeds a predetermined
amount by essentially giving the non-operating owner veto power over the
proposed charge.  While this provision
appears to limit activities on the contract area, the limitation is only for
accounting purposes.  This provision
does not alter the common-law rule of unilateral extraction and development of
minerals by cotenants.  The provision
does not restrict production activities which may be undertaken by the operator
on the contract area.   This provision
is a limitation on the non-operator=s
exposure to liability for expenses incurred by the operator.  This provision does not allow the
non-operator to prohibit operations by withholding his consent.  Accordingly, the operating agreement did not
forbid FEC from installing the water flood without Cone=s consent. 
Cone=s Points
of Error Nos. 3(a), 7(a), and 7(b) are overruled.








Texstar North America, Inc. v. Ladd Petroleum
Corporation, 809 S.W.2d 672, 675 (Tex.App. B
Corpus Christi 1991, writ den=d),
dealt with a similar provision of the typical operating agreement.  The provision at issue in Ladd Petroleum
reads as follows:  A2. Rework or Plug
Back:  Without the consent of all
parties, no well shall be reworked or plugged back.@[6]  The operator proposed for a producing well
to be reworked in order to increase its production.  The operator interpreted the Arework@ provision to mean that it
could not rework the well without the consent of all working interest
owners.  One of the non-operators
withheld his consent to the reworking of the well whereupon the operator
instituted legal action to compel the non-operator=s consent to the proposed reworking.  

The court in Ladd Petroleum ultimately held
that the operator could not compel the dissenting working interest owner to
consent to the proposed rework.  In
reaching this holding, the Corpus Christi Court of Appeals essentially ruled
that the well could not be reworked under any circumstances unless all working
interest owners agreed to the proposed rework. 
We disagree with the court=s
conclusion that the Arework@ provision constituted an
absolute prohibition against the proposed rework unless all parties consented
to the proposal.  It appears that the
rework provision was contained in the article of an operating agreement
entitled AEXPENDITURES
AND LIABILITY OF PARTIES.@   We do not believe that the provision would
have prevented the operator in Ladd Petroleum from reworking the well
without every working interest owner=s
consent if the operator chose to do so at the expense of itself and of the
consenting working interest owners.  In
this case, the provision would only prevent the operator from trying to charge
the non-consenting working interest owner.  


IV. Was Cone=s evidence of liability and damages sufficient?

A significant component of the trial court=s ruling on FEC=s no-evidence motion for
summary judgment was the determination that there was no evidence that Cone had
suffered any damages with respect to most of the causes of action he
asserted.  Cone=s damage claims fall into two broad
categories: (A) damages for future drainage; and (B) claims for charges improperly
assessed to his account.  Cone asserted
numerous theories in an effort to obtain a recovery for these damages.

 

 








 A.
Damages for Future Drainage 

1. Evidence of future drainage

With respect to drainage, Cone contends that
drainage will occur in the future from a well, known as the HAT No. 1 well,
located approximately 200 feet from the boundary of the contract area.  He contends that drainage will occur both
from primary production and from the water flood eventually causing hydrocarbons
underlying the contract area to be pushed to the HAT No. 1 well.  Attached to his response to the no-evidence
motion for summary judgment is testimony from a reservoir engineer setting
forth an estimate of the amount of drainage which will occur in the future from
the HAT No. 1 well. 

In Amoco Production Company v. Alexander, 622
S.W.2d 563, 568 (Tex.1981), the court stated the elements for recovery for
damages as between lessor/lessee for drainage. 
A lessor is entitled to recover damages from a lessee for field‑wide
drainage upon proof (1) of substantial drainage of the lessor's land and (2)
that a reasonably prudent operator would have acted to prevent substantial
drainage from the lessor's land.  The
elements would be the same for non-operator and operator.  Of course, absent the duty created by the
operating agreement, there is no cause of action for drainage as between
cotenants as each has the right to capture the minerals.  Because any cause for drainage would
necessarily include proof by the non-operator that a reasonably prudent
operator would have acted to prevent the drainage, it would be difficult, if
not impossible, to prove future drainage without proof of present
drainage.  Cone=s expert=s
affidavit does not offer any evidence that present drainage has occurred.  To the contrary, Cone=s summary judgment evidence indicated that, as
of the date of the summary judgment proceeding, his share of production had
benefitted from the water flood. 
Without evidence of present drainage, Cone=s
expert=s opinion of
future drainage is too speculative to raise a fact issue.  A party may not recover damages if those
damages are remote, contingent, speculative, or conjectural.   Cone=s
Point of Error No. 3(f) is overruled.  

2. Effect of No Evidence of Damages for Future Drainage








Cone attempted to recover damages for drainage
from FEC under theories of breach of contract, willful misconduct, gross
negligence, fraud, agency, and  breach
of fiduciary duty.  The trial court
ruled that there was no evidence of FEC=s
liability under any of these theories. 
Cone attacks each of these rulings on appeal. The trial court also ruled
that there was no evidence that Cone had incurred damages as a result of any of
these contentions.  Our holding that
there was no evidence of damages which would result from future drainage is
dispositive of several of Cone=s
points of error.  Cone=s Point of Error No. 3(d)
is overruled because it involves only a claim seeking a recovery for future
drainage.  The following points of error
are overruled to the extent that they involve an attempt to obtain a recovery
of damages for future drainage:  

Point of Error No. 3(g) (attacking trial court=s ruling that there was no
evidence of damages as a result of a breach of the operating agreement by FEC);


 

Point of Error No. 3(h) (attacking trial court=s ruling that there was no
evidence that any breach of the operating agreement by FEC constituted willful
misconduct or gross negligence); 

 

Point of Error No. 4(a) (attacking trial court=s ruling that there was no
evidence that any act or omission on the part of FEC constituted fraud);

 

Point of Error No. 4(b) (attacking trial court=s ruling that there was no
evidence that Cone sustained damages as a result of FEC=s alleged fraudulent conduct);

 

Point of Error No. 5(a) (attacking trial court=s ruling that there was no
evidence that any act or omission on the part of FEC constituted willful
misconduct);

 

Point of Error No. 5(b) (attacking trial court=s ruling that there was no
evidence that any act or omission on the part of FEC constituted willful
misconduct or gross negligence);

 

Point of Error No. 5(c) (attacking trial court=s ruling that there was no
evidence that Cone sustained damages as a result of FEC=s alleged willful misconduct);

 

Point of Error No. 6(a) (attacking trial court=s ruling that there was no
evidence that any act or omission on the part of FEC constituted gross
negligence);

 

Point of Error No. 6(b) (attacking trial court=s ruling that there was no
evidence that any act or omission on the part of FEC constituted gross
negligence);

 

Point of Error No. 6(c) (attacking trial court=s ruling that there was no
evidence that Cone sustained damages as a result of FEC=s alleged gross negligence);

 

Point of Error No. 10(a) (attacking trial court=s ruling that there was no
evidence that  FEC became the agent of
the non-operators);








Point of Error No.10(b) (attacking trial court=s ruling that there was no
evidence of the existence of a fiduciary duty existing between FEC and Cone);

 

Point of Error No. 10(c) (attacking trial court=s ruling that there was no
evidence that FEC breached any fiduciary duty it may have owed to Cone); and

 

Point of Error No. 10(d) (attacking trial court=s ruling that there was no
evidence that Cone sustained damages as a result of FEC=s alleged breach of fiduciary duty).

 

Additionally, the trial court ruled that
there was no evidence of Fagadau=s
individual liability for Cone=s
claims. The following points of error are overruled to the extent that they
involve an attempt to obtain a recovery of damages for future drainage:

Point of Error No. 11 (attacking trial court=s order granting Fagadau=s no-evidence motion for
summary judgment);

 

Point of Error No. 11(a) (attacking trial court=s ruling that there was no
evidence that Fagadau engaged in fraudulent misconduct);

 

Point of Error No. 11(b) (attacking trial court=s ruling that there was no
evidence of conduct on the part of Fagadau sufficient to impose personal
liability against him); and

 

Point of Error No. 11(c) 
(attacking trial court=s
ruling that there was no evidence that Cone sustained damages as a result of
Fagadau=s alleged
fraudulent misconduct).

 

 B. Charges Assessed to Cone=s Account

1. Theory of liability for disputed
charges

The other category of
damages sought by Cone were for charges which he claimed were improperly
assessed to his account.  Cone asserted
numerous theories to recover these charges, including breach of contract,
willful misconduct, gross negligence, and fraud.  The trial court subsequently ruled that there was no evidence of
FEC=s liability under
any of the theories asserted by Cone. 








With respect to Cone=s
claims of improper charges, each of his claims arise from specific accounting
guidelines set out in the operating agreement. 
As a general rule, the failure to perform the terms of a contract is a
breach of contract, not a tort.  Crim
Truck & Tractor Co. v. Navistar International Transportation Corporation,
823 S.W.2d 591, 597 (Tex.1992).  By
disputing the charges assessed to his account, Cone is attempting to obtain the
benefit of his bargain as provided by the operating agreement.  When the injury is only the economic loss to
the subject of a contract itself, the action sounds in contract alone.   Southwestern Bell Telephone Company v.
DeLanney, 809 S.W.2d 493, 494-95 (Tex.1991)[7];
Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 618 (Tex.1986); see Abraxas
Petroleum Corporation v. Hornburg, supra at 752-53.  Accordingly, Cone=s
contentions disputing the charges under the operating agreement are to be
considered as breach of contract claims and not tort claims. We, therefore,
review these disputed charges under a simple breach of contract theory without
requiring a showing of gross negligence or willful misconduct pursuant to our
construction of the exculpatory provision. 
Cone=s Points
of Error Nos. 3(d), 3(h), 4(a), 4(b), 5(a), 5(b), 5(c), 6(a), 6(b), 6(c),
10(a), 10(b), 10(c), and 10(d) are, therefore, overruled because: (1) they
involve claims for damages which may be caused by future drainage for which we
have found no evidence; and (2) they attempt to obtain a recovery for disputed
charges on a basis other than a simple breach of contract standard.  

2. Monthly Accounting Fee








Other than a charge of a monthly accounting fee of
$175.00, all of the disputed charges which Cone addresses in this appeal were
decided at trial.  As part of its ruling
on FEC=s no-evidence
motion for summary judgment, the trial court ruled that there was no evidence
that Cone had been damaged by the assessment of a $175.00 monthly accounting
fee by FEC.  FEC asserted in its motion
that there was no evidence of damage to Cone for the assessment of this charge
because it had paid the money back to Cone prior to trial.   The appellate court reviews only evidence
presented by the non-movant with respect to a no-evidence motion for summary
judgment.   Hight v. Dublin Veterinary
Clinic, supra at 618-19.  Cone
produced summary judgment evidence that a monthly accounting fee of $175.00 had
been assessed to his account and that the fee had been improperly
assessed.  The fact that the charges may
have been reimbursed by FEC was not part of Cone=s
summary judgment evidence.  However,
Cone acknowledges in his brief that the charges had been reimbursed.  He argues on appeal that his summary
judgment evidence raised a fact question 
regarding damages he incurred for the loss of the use of these funds prior
to reimbursement.  We find that his
summary judgment evidence raises a genuine issue of material fact in this
regard.  Cone=s Point of Error No. 3(c) is sustained.  

3. Charges for Water Purchases

A bench trial was held on the remainder of Cone=s complaints regarding
charges assessed to his account.   The
primary disputed charge litigated at trial involved the assessment of fees to
Cone=s account for the
purchase of water used in the water flood.   
FEC made an agreement with the surface owner for the purchase of water
to be used in the water flood.   FEC
paid the surface owner an initial fee of $10,000.00 for the right to draw water
from a water well and agreed to pay 4 cents a barrel for each barrel withdrawn.   However, FEC charged Cone=s account for the purchase
of this water, using a basis of 66.667 cents a barrel.[8]  Fagadau testified that he used a basis of
66.667 cents a barrel for charging Cone=s
interest because it would have cost this amount to truck water to the contract
area had FEC been required to do so.  
FEC did not use this basis in charging the other working interest owners
for the purchase of water.  Instead, the
other working interest owners were charged on the actual cost basis of 4 cents
a barrel.  








Cone contested the assessment of any charge for
the purchase of water on the basis that it was an expenditure arising from the
operation of the water flood to which he had not consented.  FEC asserted at trial that it was entitled
to assess Cone=s
account on the basis of 66.667 cents a barrel for the purchase of water.  The trial court ruled that Cone=s account could be charged
for the purchase of water but only on the basis of FEC=s actual cost of 4 cents a barrel plus his
proportionate share of the initial fee of $10,000.00 for the right to purchase
the water.  The trial court thus awarded
Cone $48,566.00 for water purchase overcharges assessed by FEC.[9]  Cone asserts in Point of Error No. 12 that
there was no evidence to support the trial court=s
finding that FEC was entitled to assess any amount for the purchase of
water.  FEC does not appeal from the
trial court=s award of
$48,566.00 to Cone.

In
order to address the no-evidence argument, we must consider only the evidence
and inferences that tend to support the finding, disregarding any evidence or
inferences to the contrary. If there is any evidence of probative force to
support the finding, the no-evidence point must be overruled.  Juliette Fowler Homes, Inc. v. Welch
Associates, Inc., 793 S.W.2d 660 (Tex.1990); In re King's Estate, 244 S.W.2d
660 (Tex.1951); see also Merrell Dow Pharmaceuticals, Inc. v. Havner, supra.

The operating agreement generally states that Aall cost and liabilities
incurred in operations under this agreement shall be borne and paid...by the
parties.@  The COPAS provides that A[m]aterials purchased shall
be charged at the price paid by Operator.@  Evidence was offered at trial to establish
that the water flood was instituted and operated upon the recommendation of an
expert.  Furthermore, the water flood
had resulted in a significant increase in production as of the date of trial. We
find evidence to support the trial court=s
determination that the actual cost of water used in operating the water flood
was chargeable to Cone=s
account as an expense incurred Ain
the necessary and proper conduct of the joint operations.@  Cone=s
Point or Error No. 12 is overruled. 

4. Assessment of non-consent penalty to Cone=s account








The other remaining charge to which Cone complains
on appeal concerns the assessment of a 300 percent Anon-consent penalty@ to his account for the drilling of a new
well.   The operating agreement provides
a mechanism whereby a party to the agreement could propose the drilling of a
new well by submitting a notification to the other parties indicating the
proposed location, depth, and cost of the new well.  Upon the receipt of such notification, the other parties have 15
days to elect to participate in the proposed well.  If a party does not elect to participate in the proposed well,
the party is then treated as a non-consenting party with respect to the new well.  If the proposed well results in a producing
well, the non-consenting party is not entitled to any proceeds resulting from
the well=s production
unless and until those parties consenting to the proposed well recover 300
percent of the cost of drilling the well. 


FEC proposed the drilling of a well it referred to
as the Clayton-Johnson 22-B2 well/Unit No. 11 well[10]
by sending Cone a letter dated March 11, 1996, providing information regarding
the proposed location of the well and the reasons why FEC felt the well should
be drilled.  Attached to the proposal
was a geological report and a plat indicating the proposed location for the
Unit No. 11 well.  These documents
indicated that the Unit No. 11 well was intended to serve as an offset to the
HAT No. 1 well located approximately 200 feet from the boundary of the contract
area.[11]  Cone did not elect to participate in the
drilling of the Unit No. 11 well. 
Ultimately, the Unit No. 11 well was 

not drilled because the Railroad Commission denied FEC
application for drilling at the proposed location.

FEC subsequently sent a proposal dated August 30,
1996, to Cone proposing to drill a well identified as the Clayton-Johnson AB@ #3 well/Unit No. 12 well.[12]  The proposal included a cover letter, an
estimate of the cost to drill the well, and a plat of the Unit No. 12 well=s proposed location.  The proposal stated that the Unit No. 12
well was to be drilled to a depth of 6,700 feet Awhich
is a depth sufficient to test the Upper Spraberry sand.@  The
proposal informed Cone that he had 15 days to make his election to participate
in the drilling of the Unit No. 12 well. 
FEC followed its proposal of August 30, 1996, with a letter dated
September 11, 1996, advising Cone that he had until September 16, 1996, to
participate in the drilling of the Unit No. 12 well.  Cone did not elect to participate in the drilling of the Unit No.
12 well by September 16, 1996.  FEC asserted
at trial that Cone=s
failure to respond within the 15-day period resulted in Cone=s interest being subject to
the 300 percent non-consent penalty.  
The trial court ruled that Cone=s
interest was subject to the non-consent penalty by finding that FEC submitted a
proper proposal to which Cone did not timely respond.








Cone asserts several reasons for arguing that his
failure to participate in the drilling of the Unit No. 12 well by September 16,
1996, should not be binding upon him.  
He argues in his brief that his failure to timely respond to the well=s proposal was excused by
FEC=s material breach
of the operating agreement.  See
Hernandez v. Gulf Group Lloyds, 875 S.W.2d 691, 692 (Tex.1994).  However, it does not appear that Cone
asserted this theory in the trial court or sought findings of fact regarding
this theory.  Accordingly, Cone has not
preserved his material breach argument for appellate review.  TEX.R.APP.P. 33.1.  

Cone additionally cites a letter sent by FEC to
Cone dated October 14, 1996, which stated as follows:  

The
drilling rig for the AB@ #2 Well will be on
location tomorrow, and we will drill to a total depth of 6500 feet to test the
Lower Sprayberry section now producing in the offset HAT OIL - #2
Clayton- Johnson.  (Emphasis in
original)

 

Cone testified that he believed the letter=s reference to the AB@
#2 well, which had been used in the letter of March 11, 1996, when FEC proposed
the drilling of the Unit No. 11 well, meant that FEC was reporting on the
commencement of drilling the Unit No. 11 well proposed on March 11, 1996.  Fagadau testified that the October 14, 1996,
letter referred to the Unit No. 12 well which was proposed on August 30, 1996,
and that the letter=s
reference to the AB@ #2 well was a clerical
error.  Cone also asserts that FEC
should have issued a new drilling proposal because the proposed depth and
location for the well had been changed. 
Finally, Cone contends that FEC should have notified him of a decision
issued by the Railroad Commission on October 11, 1996, with regard to the HAT
No. 1 well.  This decision was issued in
reference to FEC=s
application for a minimum spacing exemption for drilling the Unit No. 11 well
referenced in FEC=s
proposal of March 11, 1996.  The
decision contains a finding by the Railroad Commission that the HAT No. 1 well
was producing from the same reservoir as the wells covered by the operating
agreement.  Cone contends that he would
have elected to participate in the Unit No. 12 well had he known this
information.








We find that the evidence supports the trial court=s ruling that Cone was
subject to the 300 percent non-consent penalty for the Unit No. 12 well.  The events upon which Cone relies occurred
after September 16, 1996, the deadline for electing to participate in the drilling
of the Unit No. 12 well.  Fagadau
testified that the reference to the AB@ #2 well in his letter of
October 14, 1996, was a clerical mistake and was not intended as a
misrepresentation to Cone.  The finding
by the Railroad Commission regarding the neighboring well was made in reference
to the application to drill the Unit No. 11 well proposed on March 11, 1996,
rather than the Unit No. 12 well proposed on August 30, 1996.  Furthermore, the evidence indicated that a
question existed as to whether or not FEC was aware of the Railroad Commission=s finding at the time the
October 14, 1996, letter was written. 
Cone=s Point of
Error No. 13 is overruled. 

 V. Did FEC convert Cone=s property by withholding Cone=s proceeds?

The trial court=s
ruling on FEC=s
no-evidence motion for summary judgment involved an additional matter
concerning the charges disputed by Cone. 
He complains in Points of Error Nos. 8(a), 8(b), 8(c), and 8(d) of the
trial court=s ruling
that there was no evidence that FEC had converted Cone=s property or that Cone had incurred any
damages as a result of the alleged conversion. 
Cone asserted that FEC had committed conversion by not crediting the
full amount of the proportionate revenue generated by his interest to his
account.  This claim arises from FEC Anet checking@ Cone=s account by deducting
charges which Cone disputed from his share of the revenue generated from
production.   

Conversion occurs when one person makes an
unauthorized and wrongful assumption and exercise of dominion and control over
the personal property of another, to the exclusion of or inconsistent with the
owner's rights.  Waisath v. Lack's
Stores, Inc., 474 S.W.2d 444, 447 (Tex.1971). 
We find that Cone=s
summary judgment evidence did not raise a genuine issue of material fact
regarding his conversion cause of action. 
The operating agreement contains a provision whereby Cone and the other
non-operators granted FEC a lien on their oil and gas rights in the contract
area and a security interest in their respective shares of oil and gas
extracted from the contract area. 
Consequently, Cone authorized FEC=s
control over his share of production. 
Moreover, the proceeds attributable to Cone=s interest were credited to his account.   Cone=s
dispute centers on deductions made to his account for the charges he disputed.  Conversion does not lie for indebtedness
that may be discharged by the payment of money generally.  See Newsome v. Charter Bank Colonial, 940
S.W.2d 157, 161 (Tex.App. - Houston [14th Dist.] 1996, writ den=d); Estate of Townes v. Townes, 867 S.W.2d 414, 419 (Tex.App. -
Houston [14th Dist.] 1993, writ den=d). Cone=s Points of Error Nos. 8(a), 8(b), 8(c), and
8(d) are overruled.








VI. Were the sanctions and attorney=s fees awarded by the court supported

 in law and
fact?

 

A.
Sanctions assessed against Cone

 

Cone complains in Point of Error No. 14 of the
trial court=s order
requiring him to pay FEC $65,306.95 as sanctions under TEX.R.CIV.P. 13.   FEC sought the recovery of $65,306.95 in
its request for the imposition of Rule 13 sanctions.  FEC=s
trial counsel testified that FEC had incurred attorney=s fees of $130,613.91 with respect to this
matter and that he attributed 50 percent of these fees to the defense of tort
claims asserted by Cone.  The trial
court=s final judgment
stated as follows:

[FEC]
shall have and recover judgment from [Cone] in the amount of $65,306.95 for
attorney=s fees, as
sanctions under Tex.R.Civ.P. 13.  In
this regard the Court finds that Counterclaims asserted by [Cone] were
groundless and brought for the purpose of harassment.  Good cause exists for the imposition of these sanctions because
intended harassment was so significant that it was apparent that [Cone=s] primary intent in the
pursuit of the groundless Counterclaims was to inflict economic harm upon
[FEC].

 

Cone contends that the imposition of sanctions was improper
because the trial court failed to comply with the procedural requirements for
imposing sanctions under Rule 13.  

The
imposition of Rule 13 sanctions is within the discretion of the trial
court;  thus, we set aside its decision
only on a showing of a clear abuse of discretion.  See GTE Communications Systems Corporation v. Tanner, 856 S.W.2d
725, 730 (Tex.1993);  Texas-Ohio
Gas, Inc. v. Mecom, 28 S.W.3d 129, 135 (Tex.App. - Texarkana 2000, no pet=n).  A trial court abuses its discretion when
it acts in an unreasonable and arbitrary manner or when it acts without
reference to any guiding rules or principles. 
Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42
(Tex.1985), cert. den=d,
476 U.S. 1159 (1986); Texas-Ohio Gas, Inc. v. Mecom, supra at
135.  








Rule 13 states that  "[n]o sanctions under this rule may be imposed except for
good cause, the particulars of which must be stated in the sanction
order."  When imposing Rule 13 sanctions,
the trial court is required to make specific findings of good cause justifying
the sanctions.  Failure to comply with
this clear directive is an abuse of discretion.  Texas-Ohio Gas, Inc. v. Mecom, supra at
135; Tarrant County v. Chancey, 942 S.W.2d 151, 155-56 (Tex.App. - Fort
Worth 1997, no writ); Friedman and Associates, P.C. v. Beltline Road, Ltd., 861
S.W.2d 1, 3 (Tex.App. - Dallas 1993, writ dism'd agr.); Zarsky v. Zurich
Management, Inc., 829 S.W.2d 398 (Tex.App. - Houston [14th Dist.] 1992, no
writ); GTE Communications Systems Corp. v. Curry, 819 S.W.2d 652, 653-54
(Tex.App. - San Antonio 1991, no writ); Kahn v. Garcia, 816 S.W.2d 131
(Tex.App. - Houston [1st Dist.] 1991, no writ).  

Cone
contends that the trial court failed to sufficiently set out its findings of
good cause justifying the imposition of Rule 13 sanctions.  However, Cone did not object to this alleged
deficiency of the trial court=s order. 
Cone thereby waived any error regarding the lack of particularized
findings in the order imposing sanctions.  
See TEX.R.APP.P. 33.1; Texas-Ohio Gas, Inc. v. Mecom, supra at
135-36; Alexander v. Alexander, 956 S.W.2d 712 (Tex.App. - Houston [14th
Dist.] 1997, pet=n den=d); 
Land v. AT & S Transportation, Inc., 947 S.W.2d 665 (Tex.App. -
Austin 1997, no writ);  Campos v.
Ysleta General Hospital, Inc., 879 S.W.2d 67 (Tex.App. - El Paso 1994,
writ den=d); McCain v. NME Hospitals, Inc., 856
S.W.2d 751 (Tex.App. - Dallas 1993, no writ).  


Cone
also contends that the trial court=s failure to conduct a separate
evidentiary hearing on the question of imposing Rule 13 sanctions constituted
an abuse of discretion.   FEC included a
request for Rule 13 sanctions in its answer filed in response to Cone=s counterclaims.  FEC=s trial counsel made reference to FEC=s request for the imposition of Rule 13 sanctions during his
opening statement.  The record reveals
that evidence was offered on matters bearing on the question of Cone=s motivations in pursuing this litigation.  We find that the bench trial constituted a
hearing on FEC=s request for the imposition of Rule 13
sanctions as required by the rule.








Cone
asserts in his reply brief that his counterclaims were neither groundless nor
brought for the purpose of harassment. 
Rule 13 authorizes trial courts to impose sanctions against an attorney,
a represented party, or both, for filing a pleading that is either:  (1) groundless and brought in bad faith; or
(2) groundless and brought to harass. 
Texas-Ohio Gas, Inc. v. Mecom, supra at
136; Emmons v. Purser, 973 S.W.2d 696, 700 (Tex.App. - Austin
1998, no pet=n); 
Monroe v. Grider, 884 S.W.2d 811, 817 (Tex.App. - Dallas
1994, writ den=d); see also Rule 13; GTE
Communications Systems Corporation v. Tanner, supra at 730-31.  "Groundless" means no basis in law
or fact and not warranted by a good faith argument for the extension,
modification, or reversal of existing law. 
Rule 13;  GTE
Communications Systems Corporation v. Tanner, supra at 730.  A trial court abuses its discretion by
imposing Rule 13 sanctions for claims that are not groundless.  Texas-Ohio Gas, Inc. v. Mecom, supra at
139.

The
trial court=s judgment does not enumerate which of
Cone=s counterclaims it determined to be
groundless and brought in bad faith. 
FEC=s request for Rule 13 sanctions cited Cone=s tort counterclaims as the basis for its request.  We do not believe that Cone=s counterclaims sounding in 
contract  were  groundless 
because  the  claims 
asserted  specific  provisions of the operating 

agreement which Cone
asserted were breached by FEC and were supported by arguable facts.  We, therefore, focus our attention on Cone=s tort claims.   

It is
significant to note that the trial court granted FEC=s special exception to the extent that Cone could only seek
to impose liability against FEC under the operating agreement upon a showing of
gross negligence or willful misconduct. 
The practical effect of this ruling was that Cone was required to allege
gross negligence and/or willful misconduct, both of which are causes of action
sounding in tort, in order to litigate FEC=s alleged breaches of the operating
agreement.  We have previously
determined that the trial court=s blanket ruling in this regard was incorrect.  It is against this backdrop that we analyze
the merits of Cone=s tort claims.








Cone
alleged causes of action for fraud, willful misconduct, gross negligence,
conversion, and breach of fiduciary duty. 
Under the heading of AFRAUD, WILLFUL MISCONDUCT, AND GROSS
NEGLIGENCE,@ Cone complained of the following matters:
(1) FEC=s agreement with a neighboring
operator without Cone=s
knowledge or consent with respect to the location of the HAT No. 1 well; (2)
FEC=s failure to
notify Cone of a determination made by the Railroad Commission regarding the
formation from which the HAT No. 1 well was producing; and (3) FEC=s misidentification of a
proposed well.  Cone also alleged a
claim for conversion with respect to oil and gas revenues not credited to his
account.  Cone additionally alleged a
claim for breach of fiduciary duty against FEC.              With respect to
the agreement made with the neighboring operator concerning the location of
wells, Cone sought to obtain a recovery for future drainage by asserting that
FEC had impermissibly waived its right to object to the location of the HAT No.
1 well.[13]   In order for the HAT No. 1 well to be
drilled, the neighboring operator was required to obtain an exception from the
Railroad Commission=s
minimum spacing requirements.[14]  FEC entered into an agreement with the
neighboring operator whereby FEC waived its right to assert an objection to the
neighboring operator=s
application to the Railroad Commission. 
The Railroad Commission subsequently granted the neighboring operator=s application to drill the
HAT No. 1 well closer to the contract area than ordinarily permitted by the
Commission=s
well-spacing rules.   Cone asserted that
FEC=s agreement with
the neighboring operator was improper without FEC notifying Cone of either the
neighboring operator=s
application or FEC=s
agreement to waive objection to the application.  We have upheld the trial court=s
denial of Cone=s
recovery under this contention on the basis that it sought a recovery for
future drainage.  

Cone asserted that FEC=s agreement with the neighboring operator violated
the following provision of the operating agreement Article XIV C., titled,
COMPLIANCE WITH LAWS AND REGULATIONS, Regulatory Agencies, which reads as
follows:

Nothing herein contained shall grant, or be
construed to grant, Operator the right or authority to waive or release any
rights, privileges, or obligations which Non-Operators may have under federal
or state laws or under rules, regulations or orders promulgated under such laws
in reference to oil, gas and mineral operations, including the location,
operation, or production of wells, on tracts offsetting or adjacent to the
Contract Area.

 








Cone included a copy of the written settlement agreement executed
by FEC and the neighboring operator in his summary judgment evidence.  Our review of the settlement agreement
indicates that  FEC did not waive any
right of Cone or any other party other than FEC=s
rights as operator.  However, there is
some authority that FEC possibly had some duty to inform Cone of the
neighboring operator=s
application to drill the neighboring well. 
The court in H.G. Sledge, Inc. v. Prospective Investment and Trading
Company, Ltd., 36 S.W.3d 597, 604-05 (Tex.App. B
Austin 2000, pet=n den=d), considered the question
of which parties are to be notified upon the filing of an application for a
Rule 37 exemption.  The court noted that
the Railroad Commission considers notice given to the operator as constituting
notice to non-operating mineral interest owners.  Accordingly, we find that Cone=s
contention that FEC inappropriately entered the agreement with the neighboring
operator without Cone=s
knowledge was not groundless. 

We have previously addressed Cone=s claim regarding FEC=s non-disclosure of the
Railroad Commission=s
determination that the HAT No. 1 well was producing from the same formation as
the wells located on the contract area in discussing FEC=s assessment of the non-consent penalty for
the Unit No. 12 well.  The Railroad
Commission issued a ruling on October 11, 1996, which found that the HAT No. 1
well was producing from the same formation as the wells located on the contract
area.  Cone contends that FEC should
have notified him of this determination because it conflicted with information
previously provided by FEC. 
Specifically, FEC=s
proposal of March 11, 1996, to drill the Unit No. 11 well included a geological
report which stated that the HAT No. 1 well was not producing from the same
formation.  Cone asserted that he would
have participated in the drilling of the Unit No. 12 well had he known of the
determination made by the Railroad Commission. 
We have sustained the trial court=s
judgment that Cone is subject to the non-consent penalty for the Unit No. 12
well because the matters alleged by Cone occurred after his deadline for participating
in the well had expired.  However, we do
not find Cone=s claims
concerning the lack of disclosure of the Railroad Commission=s order to be
groundless.  Even in the absence of a
confidential relationship, when one makes a representation, he has a duty to
disclose new information when he is aware the new information makes the earlier
representation misleading or untrue. 
Susanoil, Inc. v. Continental Oil Co., 519 S.W.2d 230, 236 n. 6
(Tex.Civ.App. B San
Antonio 1975, writ ref=d
n.r.e.); see Anderson, Greenwood & Co. v. Martin, 44 S.W.3d 200, 212-13
(Tex.App. B Houston
[14th Dist.] 2001, no pet=n).  

Cone=s
claim for misidentification of the Unit No. 12 well was also not
groundless.  Fagadau admitted during his
testimony that his letter of October 14, 1996, mistakenly included a well  designation which had been used with the
previously proposed well.  With respect
to Cone=s claim of
conversion, there was evidence that a portion of his share of the production
revenues were not credited to his account because of his refusal to pay
disputed charges.  This claim had a
basis in law and fact because the proceeds of the sale of oil and gas are
things that can be converted.  See W. B.
Johnson Drilling Company  v. Lacy, 336
S.W.2d 230, 233 (Tex.Civ.App. B
Eastland 1960, no writ).








Cone also included a claim for breach of fiduciary
duty against FEC.  Several cases have
addressed the question of whether or not an operator under a similar operating
arrangement owes a fiduciary duty to non-operators.   See Rankin v. Naftalis, supra at 945-46; Johnston v. American
Cometra, Inc., 837 S.W.2d 711, 716-17 (Tex.App. B
Austin 1992, writ den=d).  These cases have routinely held that a joint
operating arrangement to develop a particular lease does not in and of itself
create a fiduciary relationship.  Rankin
v. Naftalis, supra at 946.  These cases
have also determined that a joint operating agreement does not necessarily
imply the existence of a special relationship between the parties.  See Crowder v. Tri-C Resources, Inc., 821
S.W.2d 393, 399 (Tex.App. B
Houston [1st Dist.] 1991, no writ); Taylor v. GWR Operating Company, 820 S.W.2d
908, 911-12 (Tex.App. B
Houston [1st Dist.] 1991, writ den=d);
Hamilton v. Texas Oil & Gas Corp., 648 S.W.2d 316, 320 (Tex.App. B El Paso 1982, writ ref=d n.r.e.).  However, these cases have held that a
fiduciary relationship may exist if a Aspecial
relationship@ exists
between the parties in the form of a partnership, joint venture, or agency
relationship.  See Norman v. Apache Corporation,
19 F.3d 1017, 1024-25 (5th Cir. 1994). 
Cone asserts that FEC owed him a fiduciary duty by alleging that an
agency relationship existed between FEC and the working interest owners.  The court in Johnston recognized that
an operator may owe a fiduciary duty to non-operators if the operator acts as
their agent.  Accordingly, there was a
basis in law for Cone=s
claim of breach of fiduciary duty. 

We find that Cone=s
tort claims were not groundless in that there was some basis in law and fact
for their assertion.  Simply because
Cone could not prove his claims at trial does not mean that they were
groundless.  As held in Texas-Ohio
Gas, Inc., the trial court abuses its discretion by imposing Rule 13
sanctions for claims that are not groundless. 
We, therefore, sustain Cone=s
Point of Error No. 14 by reversing the trial court=s judgment ordering Cone to pay FEC $65,306.95
as Rule 13 sanctions and render judgment in Cone=s
favor with respect to the imposition of Rule 13 sanctions.  

 B.
Cone=s Claim
for Attorney=s
Fees








Cone complains of the trial court=s failure to include an
award for attorney=s
fees in Point of Error No. 15.  He
contends that the trial court should have awarded him attorney=s fees incurred in order to
obtain the judgment of $48,566.00 for water charges assessed by FEC under TEX.
CIV. PRAC. & REM. CODE ANN. ch. 38 (Vernon 1997).  Cone contends that an award of attorney=s fees is mandatory under Chapter 38 whenever
a party obtains a recovery on a breach of contract claim.  See Bocquet v. Herring, 972 S.W.2d 19, 20
(Tex.1998); D.F.W. Christian Television, Inc. v. Thornton, 933 S.W.2d 488, 490
(Tex.1996).

The trial court made the following finding of fact
with respect to the recovery of attorney=s
fees:

4.
With regard to the respective claims for attorney=s
fees:

 

A. The amount of reasonable and necessary attorney=s fees incurred by [FEC] in
the successful pursuit of its claims for declaratory relief, as well as in the
successful defense of the claims for declaratory relief sought by [Cone] equal
and offset the amount of attorney=s
fees incurred by [Cone] in the successful pursuit of the claims he made against
[FEC] in regard to water costs.

 

Thus, contrary to Cone=s
contention, the trial court essentially awarded him attorney=s fees for obtaining a
recovery on his breach of contract claim. 
However, the trial court completely offset his recovery of attorney=s fees by an award of an
equal amount of attorney=s
fees to FEC in connection with the pending declaratory judgment claims.  See TEX. CIV. PRAC. & REM. CODE ANN. ' 37.009 (Vernon 1997).  Cone does not complain of the award of FEC=s attorney=s fees.   Cone also does not complain of the amounts
of attorney=s fees
which the trial court awarded in this regard.  
Furthermore, he does not complain of the offsetting of attorney=s fees in this matter.[15]  Cone=s
Point of Error No. 15 is overruled.

VII. What is the personal liability of Fagadau, the
president of  FEC, 

the operator of the property? 

 








Cone complains in Points of Error Nos. 11, 11(a),
11(b), and 11(c) of the trial court=s
determination that there was no evidence of Fagadau=s personal liability to Cone.  Cone sought to impose personal liability
against Fagadau in Fagadau=s
capacity as the sole shareholder of FEC. 
Cone acknowledges that TEX. BUS. CORP. ACT art. 2.21 (Vernon Supp. 2001)
governs causes of action seeking to impose personal liability against
shareholders.  Article 2.21(A)(2) limits
a shareholder=s
liability for contractual obligations of the corporation and matters related
thereto in which the shareholder has used the corporation to perpetrate an
actual fraud primarily for the personal benefit of the shareholder.   Cone contends that Article 2.21 does not
prohibit his recovery against Fagadau because the acts of fraudulent misconduct
he has alleged against FEC were perpetrated by Fagadau.

With the exception of one allegation, all of the
fraudulent acts Cone has alleged against Fagadau seek a recovery for his claim
of future drainage which might occur from the HAT No. 1 well.  We have denied a recovery for future
drainage on the basis that the recovery Cone sought was too speculative, and we
have denied his Points of Error Nos. 11, 11(a), 11(b), and 11(c) in this
regard.  The one allegation that does
not involve a claim for future drainage is the matter pertaining to the
assessment of the non-consent penalty by FEC against Cone=s interest for the Unit No.
12 well.  Cone contends that the
assessment was fraudulent because Fagadau did not inform Cone of the Railroad
Commission=s
determination that the HAT No. 1 well was producing from the same
formation.  

The elements of fraud are:  (1) that a material representation was made;
(2) that the representation was false; (3) that, when the representation was
made, the speaker knew it was false or made it recklessly without any knowledge
of the truth and as a positive assertion; (4) that the speaker made the
representation with the intent that the other party should act upon it; (5)
that the party acted in reliance on the representation; and (6) that the party
thereby suffered injury.  Formosa Plastics
Corporation USA v. Presidio Engineers and Contractors, Inc., 960 S.W.2d 41, 47
(Tex.1998).  Fraudulent non-disclosure
requires proof of the same elements, including a showing of reliance.  Schlumberger Technology Corporation v.
Swanson, 959 S.W.2d 171, 181 (Tex.1997). 
We do not believe that Cone=s
summary judgment evidence raised a genuine issue of material fact with respect
to the element of reliance.  The injury
which Cone contends he suffered as a result of the non-disclosure was his
nonparticipation in the drilling of the Unit No. 12 well.  The deadline for Cone to participate in the
drilling of the Unit No. 12 well expired on or about September 16, 1996.  The Railroad Commission=s ruling was not issued
until October 11, 1996.  Thus, even if
FEC and/or Fagadau had promptly disclosed the Railroad Commission=s ruling to Cone, the
deadline for Cone to participate in the Unit No. 12 well had already
expired.  Cone=s Points of Error Nos. 11, 11(a), 11(b), and
11(c) are overruled.








   Conclusion

The trial court=s
award of Rule 13 sanctions against Cone in the amount of $65,306.95 is
reversed, and judgment is rendered for Cone in this regard.  The trial court=s determination that there was no evidence
that Cone suffered any damages as a result of the assessment of a monthly
accounting fee of $175.00 is reversed and remanded for further proceedings
consistent with this opinion.  The
remainder of the trial court=s
judgment is affirmed.[16]  FEC=s
request for sanctions under TEX.R.APP.P. 45 is denied.

 

W. G. ARNOT, III

CHIEF JUSTICE

 

December 20, 2001

Publish.  See TEX.R.APP.P.
47.3(b).

Panel
consists of: Arnot, C.J., and

Wright,
J., and McCall, J.











[1]The record reflects that one producing well was
converted into an injection well.  The
record additionally shows that production occurred for approximately one month
from a well which was drilled for the purpose of being an injection well in
order to clean out the formation for injection purposes.  Cone=s
contentions are directed at both of these wells.





[2]This document is typically referred to as a ACOPAS@ and is so
referenced herein.





[3]The opinion in Abraxas was issued after the
trial court=s judgment was entered in this matter.  The trial court did not have the benefit of
the Abraxas opinion at the time it made its decision.





[4]At least one court of appeals has held that purely
legal issues can never be the subject of a no-evidence motion for summary
judgment.  Harrill v. A.J.=s Wrecker Service, Inc., 27 S.W.3d 191, 194 (Tex.App. B Dallas 2000, pet=n
dism=d w.o.j.).  The
court in Harrill summarily reversed and remanded the trial court=s ruling on a no-evidence motion for summary judgment
based on a claim of preemption by federal law on the basis that the no-evidence
motion for summary judgment was an improper motion to raise the preemption
argument.

 

FOOTNOTE NO. 4 CONTINUED:

 

We do not
agree with Harrill=s per se reversal and
remand of a no-evidence motion for summary judgment that may involve a purely
legal issue.  Rule 166a(i)
provides:  AThe court must grant the
motion unless the respondent produces summary judgment evidence raising a
genuine issue of material fact.@  A fact is material only if it affects the
outcome of the suit under the governing law. 
See Lampasas v. Spring Center, Inc., 988 S.W.2d 428, 433 (Tex.App. B Houston [14th Dist.]
1999, no pet=n).  Such a determination can only be made by reliance
on the substantive law, and only those facts identified by the substantive law
can be considered material.  Lampasas v.
Spring Center, Inc., supra. 
Accordingly, the court must determine the law which is applicable to the
case with respect to any no-evidence motion for summary judgment in order to
determine if the summary judgment evidence raises a genuine issue of material
fact.   The fact that a dispute exists
with respect to the applicable law does not prevent the court from performing
its function of analyzing the non-movant=s evidence to determine if it raises a fact
issue.  





[5]The non-extracting cotenant is not without remedy.  The extracting cotenant must account to the
remaining cotenants on the basis of the value of any minerals taken, less the
necessary and reasonable costs of production and marketing.  Burnham v. Hardy Oil Co., supra at 335.





[6]The provision quoted in Ladd Petroleum is
identical to another provision contained in the article entitled AEXPENDITURES AND LIABILITY OF PARTIES@ of the operating agreement at issue in this appeal.





[7]In Formosa Plastics Corporation USA v. Presidio
Engineers and Contractors, Inc., 960 S.W.2d 41 (Tex.1998), the supreme court
addressed an exception to the holding in Southwestern Bell Telephone Company v.
DeLanney, supra, with respect to claims of fraudulent inducement.  Cone has asserted various claims of
fraud.  However, he does not claim that
he was fraudulently induced to enter into an agreement.  He contends that FEC fraudulently assessed
charges against him under the operating agreement.  The general rule announced in Crim Truck & Tractor Co. v.
Navistar International Transportation Corporation, supra, that the failure to
perform the terms of a contract is a breach of contract, not a tort, governs
this action. Crim Truck & Tractor Co. v. Navistar International
Transportation Corporation, supra at 597; see Formosa Plastics Corporation USA
v. Presidio Engineers and Contractors, Inc., supra at 46-47.





[8]The evidence showed that Cone=s ownership interest in the contract area was
approximately 5 percent.  FEC calculated
the amount assessed to Cone=s account for
the purchase of water by first multiplying the number of barrels of water
purchased by 66.667 cents.  FEC then
charged Cone=s account for approximately 5 percent of this amount in
proportion to his ownership interest in the contract area.





[9]Even though Cone had disputed the amount of charges
assessed by FEC for water purchases, FEC had already collected the charges from
Cone by deducting these charges from his proportionate share of production from
the contract area.  The operating
agreement permitted FEC to deduct  Cone=s proportionate share of expenses from his share of
production if Cone did not timely pay his share of expenses.  This practice is referred to as Anet-checking@ in
the oil and gas industry.  





[10]We refer to this well as the AUnit No. 11 well@ for
the sake of clarity.





[11]The HAT No. 1 well is the same well which we have
discussed in addressing Cone=s claim of
future drainage.





[12]FEC subsequently referred to this well as the AUnit No. 12 well.@  We will refer to this well as the Unit No.
12 well for the sake of clarity.





[13]We have previously discussed the HAT No. 1 well in
addressing Cone=s claim for future drainage and the assessment of the
non-consent penalty for the Unit No. 12 well.





[14]The Railroad Commission=s
statewide spacing rules are set out in 16 TEX. ADMIN. CODE ' 3.37 (2001)(Tex. R.R. Comm=n Spacing Rules). 
An application to drill a well within the Railroad Commission=s minimum spacing requirements is commonly referred to
as a ARule 37" application.





[15]We note that a party=s
recovery of attorney=s fees may be offset against recoveries obtained by the
opposing party.  See Satellite Earth
Stations East, Inc. v. Davis, 756 S.W.2d 385 (Tex.App. - Eastland 1988, writ
den=d).





[16]Cone complains in Point of Error No. 3(d) that the
trial court erred in determining that there was no evidence that FEC withheld
funds to which Cone was entitled.  He
complains in Point of Error No. 3(g) that the trial court erred in determining
that there was no evidence that Cone incurred any damages as a result of any
breach of the operating agreement which FEC may have committed.  These points of error are overruled
because:  (1) the matters addressed
therein have been considered in discussing his other points of error; and (2)
they do not accurately reflect the trial court=s
final judgment in this cause. 
Specifically, the trial court=s
award of $48,566.00 to Cone for improper water charges constituted a
determination that FEC had improperly withheld funds from Cone and that Cone
had incurred damages as a result of a breach of the operating agreement.